GOODRICH TRANSP. CO. (UNITED STATES v.). See Case No. 15,228.

## Case No. 5,547.

### In re GOODRIDGE.

[2 N. B. R. 324 (Quarto, 105).] [1]

District Court, S. D. New York. Dec. 15, 1868.

BANKRUPTCY — SPECIFICATIONS IN OPPOSITION TO DISCHARGE.

Where specifications in opposition to the discharge of the bankrupt set forth that he had concealed property in the hands of his brother, and the only evidence in support thereof being the testimony of the bankrupt and his brother, from which badges and indicia of fraud were

[1] [Reprinted by permission.]

deduced, and not overborne by the positive testimony, *held*, that the specifications were sustained and discharge refused.

[Cited in Re Rainsford, Case No. 11,537; Re Antisdel, Id. 490.]

In bankruptcy.

H. P. Herdman, for creditors.
Charles Mott, for bankrupt.

BLATCHFORD, District Judge. The substance and effect of the five specifications filed in opposition to the discharge of the bankrupt in this case are, that the bankrupt has wilfully sworn falsely in his examination before the register, in swearing that he had no property when his petition was filed, except the exempt property named therein, and no property concealed in the hands of his brother, John R. Goodridge, and that his said brother was not indebted to him; that the bankrupt has concealed property in the hands of his said brother, and has not delivered it to the assignee; and that, for the purpose of preventing the sum of from four to five thousand dollars from being distributed among his creditors in bankruptcy, he has resorted to the device of keeping that sum in the hands of his said brother, claiming that it was paid to him in discharge of a debt.

A fraud of the kind here alleged is one that can seldom be proved by other than circumstantial evidence. The parties to the transaction are generally, as in this case, the only witnesses, and if their stories are to be believed as told, no fraud can be established. External evidence is not to be had, and the truth must be reached by examining the evidence of the alleged parties to the fraud, and weighing its probabilities and scrutinizing its general tenor and manner. In the present case, the story of the bankrupt and his brother, as they tell it, is as consistent with a fraud as with an honest transaction, and if the alleged fraud was to be perpetrated, a natural way to consummate it, with the hope of escaping detection, would have been the way employed in this case. The determination of the question of fraud or no fraud, must, under such circumstances, depend upon the impression made by the evidence of the parties concerned. Of course, those who would commit such a fraud, would swear falsely to carry it through. If their positive testimony to the honesty of the transaction is overborne by badges and indicia of fraud, deduced from their own testimony, the conclusion must be that there was fraud. If their positive testimony to the honesty of the transaction is true, and there was no fraud, there will not be found in their testimony any badges and indicia of fraud, sufficient to overbear such positive testimony. Applying these principles to the evidence of the bankrupt and his brother in this case, I cannot resist the conclusion that the four or five thousand dollars which the bankrupt alleges he made for his brother at the West, was not made for his brother, and was not his brother's property, but was the bankrupt's property. It was used by the bankrupt for his own purposes, and calling it a debt due to his brother, he claims that he paid it up by installments, the last of which was paid somewhere in the first half of the year 1867. The impression made by the whole testimony of the bankrupt is very unfavorable. When any test is sought to be applied, by close questions, to a positive statement of his, his recollection always fails. He says he purchased lands at the West for his brother, but cannot recollect how much his brother paid him for his services, or anything about it, except that they settled. His general statement is that when he left the Western country he had made for his brother some four to five thousand dollars, which was paid over to his brother at different times afterwards in New York. When asked how long it was since he finished paying that money, he says: "A little over a year, I think." Again, he says: Q. "When, and as near as you can tell, was it, that you and your brother settled, and what was the basis of that settlement in relation to the matters connected with the Western lands?" A. "There was no final settlement of all matters until I paid him the balance due him, a little over a year ago." Q. "How much was the balance then due him?" A. "I don't recollect; but I paid him at different times, from time to time, since I came to New York." Q. "In that final settlement was any allowance made by your brother for your services in purchasing said land?" A. "Yes." Q. "How much?" A. "I don't recollect the amount." The purchase of the lands at the West was evidenced by land certificates, all of which the bankrupt, and not his brother, received; and his brother was never at the West, but was in New York, while the bankrupt then lived in Wisconsin. On his examination by his own counsel, the bankrupt is called on to explain and does it in this way: Q. "You testified that you could not tell exactly how much or what amount you received; that it was a good while ago. Explain what you mean by that." A. "We had an understanding at that time, about the time I came to New York, how much I was to receive up to that time. There was no money paid at the final settlement, about a year and a half ago." On his further examination on the part of the creditors, he says: Q. "How does it happen that you remember that you footed up and paid your brother four or five thousand dollars so definitely, and can't remember at all the amount or anything like the amount you received as commissions?" A. "I don't think it exceeds five hundred dollars that I received from him." Q. "Did you take or give a receipt on said last-mentioned settlement?" A. "I don't remember of passing receipts." The recollection of the brother is equally at

fault when any test is sought to be applied, and his testimony is equally vague and general with that of the bankrupt. Thus: Q. "When did he pay it to you?" A. "He was paying me all the time from the time when he came back to New York from Wisconsin up to about a year and a half ago, when we settled in full for all except what is on the schedules." The items on the schedules all accrued before he went West. The bankrupt went West in 1854. The item on the schedules due to his brother is a debt of three hundred dollars, contracted in 1853. The transactions in the Western lands were between 1854 and 1858 or 1859. In 1858 or 1859, the bankrupt removed to New York. It is a strange circumstance that the bankrupt should pay his brother this alleged debt of four or five thousand dollars, and still leave standing a prior one of three hundred dollars, but not at all strange that if he were putting four or five thousand dollars into his brother's hands as a cover, he should leave the old debt of three hundred dollars standing. Still further, the brother says: Q. "How much money did he pay you in all?" A. "I couldn't state exactly, but somewhere from four to five thousand dollars." Q. "How did that indebtedness accrue, or how did he come to owe you that sum?" A. "From investing the money I sent him at Chicago in a lot there, selling the contract for the purchase of the lot, whereby a sum of money was made, and continuing to invest that money in school and swamp lands in Wisconsin for me, and in selling said lands and investing in others, etc." Q. "How much money was made on the Chicago lot?" A. "It would be impossible for me to tell." Q. "Do you know how many acres, or about how many acres of school and swamp lands your brother purchased for you while in Wisconsin?" A. "I cannot tell you now, but it was some thousands of acres." Q. "Do you know in any other way except by the account rendered by your brother, how many acres was purchased or sold, or what profit was made on them?" A. "I do not. I never went to Wisconsin. I relied wholly on my brother, and our business was transacted wholly by letter, except the time when he came to New York, and I saw him in person." Q. "Did you instruct him to continue investing this money, or did he do it of his own volition, without consulting you?" A. "The acts of my brother were according to my directions, but he was left to use his judgment and discretion. My instructions to him were general." Q. "Have you any of those land certificates now?" A. "I have." Q. "How many acres?" A. "I think there are eighty acres." Q. "Was there ever any understanding or agreement between you and your brother as to what he should receive for his services in transacting the business you have stated for you?" A. "There was not, until after the transaction of the business; until he came back to New York. The understanding was, that he should be paid, but the amount was not fixed till he came back to New York." Q. "When was this understanding had between you, and how?" A. "I can't say whether it was by letter or when he came on to New York, and when I saw him personally." Q. "When did you first ascertain that he was owing you the four or five thousand dollars you have testified he paid you?" A. "When he came to New York, but I was being constantly advised by him while West, as the sum was accruing." Q. "On your settlement with him what was allowed for his services for you, in all the matters you have stated?" A. "I couldn't tell exactly, but somewhere in the neighborhood of four hundred dollars." Q. "During the time your brother was transacting this business for you in the West, did you keep any book account or memorandum of the amounts of lands he advised you from time to time he had purchased and sold on your account?" A. "I did not." In a subsequent examination the brother says: Q. "During the time your brother, the bankrupt, was in the West, did he send or pay you any money?" A. "I have no recollection of his paying me a cent; I am certain that he did not." Q. "How long after he returned from the West was it before he paid you anything?" A. "I could not say positively. It might have been about a year." Q. "What did he then pay you?" A. "He paid me at different times all along, in different sums, from that time till we settled, about a year and a half ago, when he paid me the entire balance." Q. "How much was that balance then paid you?" A. "I don't remember."

This story of the debt of four or five thousand dollars, paid in this way, is not credible, on all the evidence. It might, perhaps, be as impossible to believe the fact, that the bankrupt paid over to his brother the four or five thousand dollars, as to believe that it was paid in discharge of a debt, were it not that the bankrupt is driven by a statement of his receipts and expenditures since he removed to New York, in 1859, to account for about four thousand five hundred dollars in some way, and he does it by stating that it was paid to his brother, and for the indebtedness referred to. The specifications are sustained and the discharge refused.